Lester **BOYCE**, Plaintiff-Appellant,

v.

John F. **BARRETT** and Harry H. **Hilp**, Partners Doing Business as Barrett & Hilp, Defendants-Appellees.

No. 12491.

United States Court of Appeals Third Circuit.

Argued May 6, 1958.

Decided July 30, 1958.

Rehearing Denied Sept. 17, 1958.

I. Charles Lifland, Jersey City, N. J. (Joseph C. Glavin, Jersey City, N. J., on the brief), for appellant.

Ralph W. Chandless, Hackensack, N. J. (Chandless, Weller & Kramer, Hackensack, N. J., on the brief), for appellees.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant entered into a written contract with appellees to purchase real estate. He intended erecting a truck

terminal and leasing it to Boyce Motor Lines, Inc., an I.C.C. common carrier. Appellees, owners of the land, claiming appellant did not, in the terms of the agreement, diligently try to obtain the right to operate a truck terminal on the premises, retained appellant's five thousand dollar deposit as liquidated damages. The district court upheld that position in this suit for return of the deposit.

The action was originally started in the New Jersey Superior Court. Plaintiff-appellant is a resident of New York State. Defendants-appellees are residents of California. The case was removed to the district court by reason of the diversity of citizenship.

Appellant is the president and principal stockholder of Boyce Motor Lines, Inc., a New York corporation engaged in the trucking business and authorized to do business in New Jersey. In January 1952, the company, desiring to expand its New Jersey facilities, authorized Boyce to acquire a Bergen County, New Jersey site for a new truck terminal with the idea that Boyce erect such terminal and lease it to the corporation. Early that same month, Boyce talked the matter over with Stanley Atkins, a real estate agent. He, acting for Boyce, entered into negotiations for the purchase of the property here involved with James E. Hanson of Alexander Summer Co., the real estate firm having the premises for sale on behalf of appellees, the owners. There were considerable preliminary discussions over the terms of the proposed contract of sale and at least two tentative drafts drawn. Atkins turned over to Hanson a deposit check of $5,000 which Hanson in a letter to appellees dated June 19, 1952, mentions as having forwarded them on March 3, 1952. Attorneys for both parties came into the picture prior to the contract being executed. The lawyer representing appellees was and still is Town Counsel of the Township of South Hackensack. Boyce was expressly not interested in buying the site unless he could obtain the Township's approval to the operation of the truck terminal business contem-

plated. Prior to this time, as appears in the record, a Boyce, Inc. truck carrying carbon bisulphide had exploded and burned in the Holland Tunnel. With this in mind on April 18, 1952 the Boyce attorney sent Mr. Chandless, representing the owners, a list of chemicals which would be handled by Boyce, Inc. through its proposed South Hackensack Terminal. Carbon bisulphide was specifically noted as one of these. That letter concluded by saying:

"With this information, perhaps you may be able to learn the reaction of the City officials and advise me. I would require that my client be protected in some way against interference by the Township authorities in connection with the handling of the chemicals of the nature contained in the enclosed letter.

"Awaiting your reply, I remain"

A clause to cover the situation was suggested by Mr. Chandless. This conditioned the agreement "* * * upon the ability of the Purchaser to obtain the necessary permits in accordance with the ordinances of the Township of South Hackensack for the construction upon and use of said premises as a truck terminal to comprise and consist substantially of the following: To be built in accordance with the Building Code and other ordinances of the Township in relation to the construction of buildings; it being the obligation hereunder of the Purchaser to make such applications and to take such other steps as may be required to secure such permits."

On *May 6, 1952,* Mr. Chandless wrote the Boyce attorney as follows:

*"I have received from Barrett & Hilp executed copy of revised agreement covering South Hackensack property.*

"Since forwarding this to Barrett & Hilp and its return to me executed, I have received from your secretary revision of pages 5 and 6 so that the last three paragraphs on page 6 would appear in their proper

sequence after the second paragraph on page 5.

"I will be in a position to make this change on the executed copy by initialling the transposition. *Will you please forward me a copy executed by your client and we can exchange the same.*" (Emphasis supplied.)

He concluded his letter by saying:

"I have arranged with the Township Clerk of South Hackensack for a meeting of the Board of Adjustment in order to conduct a public hearing on the grant of a permit to operate the truck terminal in accordance with the I.C.C. rights outlined in the contract. This subject appeared confusing to the Clerk but I am furnishing him with a copy of the 4 clauses of the contract dealing with the subject, together with copy of letter of Boyce Motor Lines, Inc. to you, dated April 14, 1952. This should explain just what we had in mind. I will advise you as to date of the hearing and feel that you should make arrangements to appear at that time."

On the same date, May 6, 1952, Mr. Chandless, *as Township Attorney,* wrote the Township Clerk, John Melillo, saying:

"*At the last meeting of the Township Committee, it was determined to refer to the Board of Adjustment the question of the proposed use of the Barrett & Hilp property.* The attorney of the proposed purchaser sends me a copy of letter which he received from his client, dated April 14, 1952, which deals with the nature of their business. His accompanying letter of April 18th mentions the fact that they also handle carbon bisulphite (stet)." (Emphasis supplied.)

He set out the terms of the agreement between the parties, the understanding that Boyce, Inc. was an I.C.C. carrier and required " * * * to transport any and all merchandise submitted to it,

except dangerous explosives; that said Boyce Motor Lines, Inc. in the course of its business transports numerous chemicals and chemical derivatives some of which are inflammable depending upon flash point." He quoted the clause that " * * * this agreement is also expressly conditioned upon the ability of the Purchaser to obtain from the Board of Adjustment of the Township of South Hackensack, after public hearing in accordance with the statute, a permit to operate said truck terminal in accordance with its I.C.C. rights as above outlined."

Mr. Chandless further quoted directly from the agreement of sale to describe the proposed construction of the terminal, the nature of the building and the materials going into it. That read:

"A loading platform having poured concrete walls and reinforced platform 60 feet in width by 100 feet in length enclosed with overhead doors and a roof. Attached to said loading platform a 2-story office and dormitory building 30 feet in depth by 60 feet in width. The basement of said building to be used for heating equipment and storage; the ground floor for office space, and the second floor for sleeping accommodations for drivers. The property will also be improved with sufficient macadam paving to accommodate the business of the truck terminal, to be built in accordance with the Building Code and other ordinances of the Township in relation to the construction of buildings."

Finally he instructed the Clerk as follows:

"Will you please arrange for the Board of Adjustment to fix a date for a hearing. This date should be fixed sufficiently in advance so that we can have the attorney of the prospective purchaser on hand, as well as to allow time to give notice to adjacent property owners."

By not later than May 16, 1952 Boyce had executed a copy of the contract which was turned over to Mr. Chandless.

The agreement as executed was "expressly conditioned upon the ability of the Purchaser to obtain the necessary permits in accordance with the ordinances of the Township of South Hackensack for the construction upon and use of said premises as a truck terminal * * *." The contemplated building was described and "to be built in accordance with the Building Code and other ordinances of the Township in relation to the construction of buildings. Purchaser agrees, however, to use all due diligence to do everything required to obtain said permit to construct such truck terminal and that his efforts in that behalf must be completed prior to May 1, 1952. Failure to use such due diligence and to complete said efforts by said date shall be deemed a default hereunder. On the other hand, if Purchaser uses such due diligence and is unable to obtain the required permits by said date, then this agreement shall be null and void and there shall be no obligation as above set forth, except that the Seller shall return the deposit but shall not be responsible for title or any other expenses of Purchaser."

The agreement tied into the above condition the understanding that Boyce would lease the terminal to Boyce Motor Lines, Inc., an I.C.C. common carrier. It specified that Boyce Motor Lines "is required to transport any and all merchandise submitted to it, except dangerous explosives; that said Boyce Motor Lines, Inc., in the course of its business *transports numerous chemicals and chemical derivatives some of which are inflammable depending upon flash point."* (Emphasis supplied.) The contract also provided: "It is further understood and agreed that this agreement is also expressly conditioned upon the ability of the Purchaser to obtain from the Board of Adjustment of the Township of South Hackensack, after public hearing in accordance with the statute, a permit to operate said truck terminal in accordance with its I.C.C. rights as above outlined."

The district judge did not find when the agreement was completely executed by the parties. As seen above this occurred sometime after May 6, 1952 and by May 16, 19⁵2. In addition to the letter of Mr. Chandless of May 6, 1952, he, testifying at the trial, stated that the contract had not been signed by Boyce at the time he sent that letter.

It is uncontradicted that there was no change in the May 1 date in the contract as the time when appellant's efforts to obtain Township permission must be completed, because of the representations of appellees' attorney that he did not wish to be forced to redraw the agreement and send it back to appellees in California for re-execution.

It is not denied that Architect William Neumann, Jr. was asked on behalf of appellant to prepare plans for the truck terminal in April 1952 and that he did so in May 1952. These are dated May 6, 1952. The plans Mr. Neumann made are called sketch plans. He explained that "When there is a Board of Adjustment, or a zoning matter pending we do not go to the trouble or expense, or put an owner to the expense of preparing a complete set of plans. We prepared what we call a complete outline sketch, which shows the authorities the type of building, size of building, and what it is going to be used for, for submission. Then after the hearing, if the plan has been approved, then complete plans are filed and prepared and filed with the building department, which meets with their requirement, which show everything in detail, size of beams, columns and everything else." He testified this was the customary practice in the State of New Jersey. The plot plan was made afterwards and bears the date May 19, 1952. The latter was prepared for the township building department. Neumann testified that the furnishing of that sort of plan is "the requirement of all building departments." He also filled in the necessary technical building information on the application and returned it to the Boyce lawyer who completed it and had it, the plot plan and, (as appellant contends) the sketch plans delivered to the Town Clerk for filing, June 4, 1952.

The application was on the official printed Township form. It is stated in its opening paragraph:

"Application is hereby made to the *Township Clerk of the Township of South Hackensack, N. J., for a permit* for the (erection), (addition), (alteration) of building(s)." (Emphasis supplied.)

The plot plan was attached to the application in the space provided for. The Town Clerk testified that he did not issue any receipt for·the plans and application. He said he never does under any circumstances. The Court at that stage commented: *"The usual informal practice that obtains in small municipalities"* (Emphasis supplied). South Hackensack, according to the clerk, had when he testified (September 1956) a total of 1703 inhabitants. He recalled an application and plot plan being filed in June 1952. He stated: "I don't recall anything about plans and specifications."[1] Aside from a chief of police and three patrolmen (one man on duty at a time) he was the only Township full time employee. He testified that it was Mr. Atkins who filed the papers with him and that he placed them on the building inspector's desk. The building inspector was only on duty Monday and Thursday evenings.

Mr. Chandless wrote the Boyce attorney on May 9, 1952, saying that: "We are advised that the meeting of the Board of Adjustment of South Hackensack will be held at the Municipal Building on Thursday, May 15th, 1952 at 8:30 P.M. to discuss the use of the Barrett & Hilp property for a truck terminal."

The May 15th date was prior to the application being filed. It was postponed to June 5, 1952. As to that meeting, Philip Melillo, Chairman of the Board of Adjustment and uncle of the Township Clerk, said: "It was an informal meeting;" that he "didn't see no applications." He said he never saw the Chandless letter of May 6, 1952 to the Township Clerk concerning the transportation by Boyce, Inc. of the various chemicals including carbon bisulphide. The Board did not keep any records of the meeting.

Hanson testified that: "When the representative of Boyce attempted to file for a building permit and reported back to us that he was not getting any action on his permit, and asked for help, I agreed to try to talk to the officials of the town. And I did talk to certain officials in the town and was told that they did not want this company with their operation in the town, they were not going to have them in town." He said the officials he spoke with were the mayor and two of the three councilmen. Following that, on June 26, 1952, Hanson wrote Mr. Chandless:

"You are aware that South Hackensack will not accept Boyce Trucking Company. Since they can not operate in the town, they wish, under the terms of their contract, to have their check returned to them. We wrote to Barrett & Hilp requesting the check and they have written us to take the matter up with you.

"I am sending Dave Nordling to you and wish you would cooperate with him as you would with me to clean up this matter."

On June 27, 1952 the attorney for appellant wrote the Township Clerk:

"Some time ago an application was filed with your office for the erection of a truck terminal by Boyce Motor Lines, Inc. To date, I have not received any advice as to whether or not the application was granted or denied.

---

[1]. On cross-examination by Mr. Chandless' partner there were the following questions and answers:

"Q. Mr. Melillo, then in so far as you know the building application and the plot plan annexed thereto, which have been marked Exhibit P-e in evidence, were the only papers left with you by Mr. Atkins, is that correct? A. Yes, sir.

"Q. There was no money or any other documents left with you at that time? A. No, sir.

"Q. Either by way of check or by cash? A. No, sir."

"Will you kindly advise me at your earliest convenience."

On July 17, 1952 there was a meeting of the Township Council at which the Township Clerk states one or two of the members of the Board of Adjustment were present. He "don't believe they were all there." He said he had received the Boyce inquiry and then he read from the Township minutes of the meeting. As to this the following appears in the record:

"A. 'Communications. From Joseph C. Glavin, reference Boyce Motor Lines, Incorporated. On motion made, seconded and carried, Mr. Glavin be informed that application was denied by the Adjustment Board.'

"Q. Was that voted upon? A. Yes, sir.

"Q. What was the vote? A. It was fully carried.

"Q. Unanimous. A. Unanimous.

"Q. And as a result of that minute what did you do? A. I wrote Mr. Glavin a letter giving him the action by the township committee.

"Q. Was there any discussion among the members of the township committee, or any one else with respect to that application at that meeting? A. No, sir."

In the Township Clerk's deposition appears the following:

"Q. Was there any discussion with respect to the Boyce application at that meeting? A. Only this, I recall one of the members stating that they had gone over it and stating something about explosives being carried on trucks. That was about the extent of the conversation that I remember.

"Q. Was that a member of the township committee or a member of the Board of Adjustment? A. A member of the Board of Adjustment.

"Q. So there was a discussion between at least one member of the Adjustment Board and the township committee at that meeting? A. Yes, sir, that would be correct."

A letter on the Township letterhead dated July 23, 1952 was sent to and received by the attorney for Boyce. It reads:

"In reference to application filed for the erection of a truck terminal by Boyce Motor Lines, Inc., pleased be advised that the Adjustment Board has denied same."

Thereafter various demands were made for the return of the deposit which were refused. This suit resulted.

The district judge correctly stated the principal problem to be "whether or not plaintiff acted with due diligence in attempting to procure a building permit and a zoning variance from the Town of South Hackensack in order to construct a truck terminal on the premises in question."

His decisive finding on this is:

"The record is replete with evidence documenting the vascillation of the plaintiff to perform his agreed exchange under the bargain. His tardiness and lack of effort has been established beyond doubt so that it cannot be said that he demonstrated 'all due diligence' required of him under the agreement. I find that plaintiff's procrastination culminated in an unreasonable and inexcusable delay establishing a default under the contract."

While this litigation is founded upon a written contract to purchase real estate, the dispositive question is factual. Did appellant use the due diligence called for by the agreement? We think he did and that the district judge was clearly wrong in holding to the contrary.

What the contract demanded from Boyce was effectual action. He was "to use all due diligence to do everything required *to obtain* said permit to construct such truck terminal * * *." (Emphasis supplied.) Plainly he was not

646

asked for merely futile formal gestures. The whole project, the sale of the land, the construction of and operation of the truck terminal was conditioned upon appellant's ability to procure the Township's consent "to operate said truck terminal in accordance with its I.C.C. rights as above outlined." From a practical standpoint this meant acceptance by the municipality of Boyce, Inc. trucks, carrying the chemicals heretofore mentioned, in and out of South Hackensack and garaging so loaded in the terminal. Allowance of the terminal operation had to include that consideration. Boyce wanted the terminal but not under any false pretenses. He, through his lawyer, insisted that his company's haulage of flash point chemicals be fully disclosed, particularly with reference to carbon bisulphide as that had comprised the cargo of the Boyce truck which had burned in the nearby Holland Tunnel sometime prior to the transaction before us. It was solely for this reason that Mr. Glavin for Boyce, furnishing Mr. Chandless with the information regarding the chemicals carried, said to him: "With this information, perhaps you may be able to learn the reaction of the City officials and advise me. I would require that my client be protected in some way against interference by the Township authorities in connection with the handling of the chemicals of the nature contained in the enclosed letter. Awaiting your reply, I remain". If the Township, confronted by the true situation and fearful of the possibilities of catastrophe, refused its consent for the terminal that was the end of the attempt; the obtaining of the permit to operate the terminal would be in those circumstances and in the language of the agreement beyond "the ability of the Purchaser."

So let us as briefly as possible recapitulate the events commencing in January 1952 and see if there is justification for the trial court's conclusion that appellant's "tardiness and lack of effort has been established beyond doubt so that it cannot be said that he demonstrated 'all due diligence' required of him under the agreement."

Boyce first contacted Atkins, the real estate agent who acted for him in this matter, in January 1952 concerning a truck terminal site. Atkins immediately talked with Hanson the real estate agent who represented appellees. The transaction had so far progressed by March 3, 1952, that on or before that date Atkins turned over a Boyce $5,000 check to Hanson for appellees as a deposit on the purchase price. The record reveals no real protection to Boyce at that time but though that payment, as it developed, was extremely hazardous it would be rather amazing to argue that up to that point at least Boyce had been exhibiting tardiness and lack of effort.

Thereafter attorneys for both parties came into the negotiations and efforts were made by them to reach agreement on a form of purchase contract. It is most noteworthy, however, that it was as a consequence of the action or perhaps more accurately the inaction of appellees that the contract in final form which was acceptable to Boyce was not mailed to the Boyce attorney until May 6, 1952. That date was five days after Boyce by the term of the agreement had been bound to complete his endeavor to obtain the Township's approval on his terminal and over two months after the Boyce $5,000 deposit had been given appellees' agent. Boyce had already asked his architect to draw plans for the terminal. Because the serious issue of permission from the municipality was present, the plans were not the full dress working drafts but sketches complete enough to present the proposed operation to the Township authorities for the purpose of passing on the eligibility of the terminal. And this, says the architect, is the approved New Jersey practice to save undue expense. Right after appellees signed the contract the Boyce architect drew the plot plan and filled in the construction items of the application to build. Mr. Glavin for Boyce certified the application on June 3, 1952. It was filed with the Township Clerk the following day.

The district judge considered that filing to have been improper. He said: "Reference is made to the necessity to apply for a building permit and to accompany the application with the necessary filing fees. The Building Inspector testified that he knew no reason why a building permit should not be granted if a proper application with plans and specifications together with the fees had been submitted. 'Q. And if you had a proper application and plans and specifications and fee, is there any reason why you would not have issued a building permit? A. No reason.'"

The application was on the official South Hackensack form. As already quoted it states: "Application is hereby made to the Township Clerk of the Township of South Hackensack, N. J. for a permit for the (erection), (addition), (alteration) of building(s)." It was personally handed to the Township Clerk, John Melillo. He admits this and that a plot plan accompanied it. On direct examination he did not deny that sketch plans were with the plot plan. On cross-examination by the Township Attorney's partner he agreed he had not received anything but the application and the plot plan. (We assume the unaccountable absence of the sketch plans which had been prepared for this particular application but it is the fact that their absence did not prevent the Township authorities from passing upon the merits of the application and disposing of it.) In any event the Township Clerk accepted them and put them on the desk of an uncle of his, Ralph Melillo, the Building Inspector. That official as a witness said he found the application and plot plan on his desk. He placed them in the top drawer of his desk and did nothing further about them. He said "The only thing I know about it is they were on my desk and I waited for someone from the Boyce Trucking Terminal to come in with the fee and the plans." A moment later he admitted that he don't collect the fee until he issues the permit. And his only talk with his nephew, the Township Clerk, about the application and plot plan was when the latter asked him if he had "received this plot plan and this application. Yes, I told him I did." According to the Inspector, he never discussed the matter with Senator Chandless, any member of the Township Committee, Mr. Hanson, any member of the Board of Adjustment or other person. As to the determination of whether an application "complies with the Township Zoning Ordinance" he said, "I ask the township clerk what this certain piece of property is zoned for, and he has it all in the zoning code, zoning book." The court said to him, "You don't have to ask the clerk. Do you have a zoning map in your own office?" The witness answered "No, he has it, I haven't got any, no." Later, again answering the court, he gave his idea why the contemplated building would not be a nuisance under the Township Zoning Ordinance. He said: "Well, this wouldn't be no nuisance a truck terminal. It says 'Intended use of building: truck terminal and offices and offices and sleeping quarters.'" The court interrupted counsel's attempted start of interrogation of the witness to be centered around the Township Zoning Ordinance general provision that "Nothing herein contained shall be construed to authorize or permit the creation or maintenance of a nuisance." That interrogation never did get started after that but obviously the use to which the terminal was to be put meant nothing to the witness. As to the Boyce truck exploding in the Holland Tunnel he was asked and answered: "Q. Did you participate in any of the discussions with the township officials and the members of the volunteer fire department about the fact that Boyce's truck had exploded in the Holland Tunnel? A. No, sir. Q. You did not? A. I did not. Q. You didn't know anything about that? A. Didn't know anything about it. The Court: You didn't read in the papers about the explosion? The witness: No, I didn't read anything in the papers about it."

He was asked, *"Do you know Mr. Melillo how this application got before the Board of Adjustment?"* And he an-

swered, *"I don't know anything about that."* (Emphasis supplied.)

The Chairman of the Board of Adjustment was another uncle of the Township Clerk and presumably a brother of the Building Inspector. He is Phillip Melillo. He said the Board of Adjustment had a little informal meeting in June 1952. The date of this meeting apparently was June 5, one day after the application was filed. He first said nobody called it. He admitted to the court's query "Well, it was through the township committee." He swore he never saw the Boyce application; that he never saw the Chandless letter to his nephew, the Township Clerk, which actually arranged the meeting and presented in detail the all important problem of transportation of inflammable chemicals. He admitted to the court that he and the Board "informally discussed this application." He said that the man who was supposed to be Secretary of the Board was not present. Then he said he was there and followed that with the statement that the person who was named DeLuca, never acted as secretary of the Board of Adjustment. He said he was not present at the Township Committee meeting of July 17, 1952; he knew nothing of the Committee's resolution stating the Board of Adjustment had rejected the application or of the letter to the Boyce attorney advising of that action.

It might be well to point out here that the Zoning Board or Board of Adjustment is appointed by the Township Committee. Supplement (Apr. 3, 1952) to Township Zoning Ordinance (Aug. 19, 1938). Its duties are prescribed by the State Zoning Statute, N.J.S.A. 40:55–1.1 et seq. Under 40:55–39(d) it can:

"d. Recommend in particular cases and for special reasons to the governing body of the municipality the granting of a variance to allow a structure or use in a district restricted against such structure or use. Whereupon the governing body or board of public works may, by resolution, approve or disapprove such recommendation. If such recommendation shall be approved by the governing body or board of public works then the administrative officer in charge of granting permits shall forthwith issue a permit for such structure or use.

"No relief may be granted or action taken under the terms of this section unless such relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

And it should be emphasized that the Building Inspector, under the Building Code of the Township, deals with the nature of a building and the kind of construction and materials going into it. For example the Township Building Code contains elaborate standard methods and materials for the construction of garages but not one word about contents of trucks stored therein. The Inspector is authorized "Whenever in his opinion, *by reason of defective or illegal work in violation of a provision of this ordinance,* the continuance of a building operation is contrary to public welfare, he may order all further work to be stopped and may require suspension of work until the condition in violation has been remedied." (Emphasis supplied.) Building Code Ordinance (Aug. 7, 1947) par. 3.

It is seen immediately that the real and recognized problem was never the issuance of a building permit for the terminal building *qua* building. Counsel squarely presented this to the trial judge during cross-examination of Mr. Chandless with respect to Mr. Glavin's request of him to obtain the reaction of city officials to the transportation by Boyce, Inc. of the stated chemicals including carbon bisulphide. The court asked "Why did he (Boyce) have to go to anybody until he was turned down arbitrarily by the building inspector?" The Boyce attorney replied:

*"The reason for that is, if your Honor please, it is not a question as to whether or not a building could be*

*erected, it is a question of whether or not a permit could be obtained to erect and operate such a building.*" (Emphasis supplied.)

A little later in the same cross-examination the court showed thorough grasp of the issue when the following occurred:

"The Court: Apparently he wanted the reaction of the local officials about a truck terminal which would carry chemicals such as he mentioned in the letter, is that right, which might be stored in a truck in the garage overnight, I take it, or a period of time.

"The Witness: (Nods.)

"Mr. Lifland: As a matter of fact, it is made part of the contract. It is in the contract.

"The Court: Yes, I know. That is what he wanted.

"The Witness: This is what he sent me. So I sent it all down to the clerk.

"The Court: And you told him to arrange a meeting, or a conference.

"The Witness: At which Judge Glavin would be present and explain his position.

"The Court: And that was not the zoning board you were referring to, was it?

"The Witness: I sent it to the clerk. I got from the correspondence that the Township Committee declined to commit themselves on the proposition and instead referred it to the Board of Adjustment. That's what I got from the correspondence, yes."

Despite the above, Mr. Chandless had claimed in his testimony that he knew nothing about any explosion, that Mr. Glavin had not told him anything about it. He said, "And I knew nothing about it, I didn't know it was the same people, no." However, from his own testimony five pages further on in the transcript he certainly possessed the knowledge sometime during the course of this matter that a Boyce truck had previously exploded in the Holland Tunnel. He was asked, "Well, was there any conversation with you about an explosion prior to this time (April 18, 1952)?" His answer and the next question and his answer read:

"A. My recollection is that the explosion was a question that was raised by somebody in South Hackensack. One of the township committeemen somewhere ascertained that Boyce had had an explosion sometime previously in the Tunnel, but that—my best recollection is that is something that came out later.

"Q. Can you tell us when, about when? A. After this—apparently I think I heard about it from one of the real estate brokers. That is my recollection now. I don't think I ever heard of it from Mr. Glavin."

And in Mr. Chandless' deposition appears the following question and answer:

"Q. Let me see if I can refresh your recollection. Isn't it a fact that you made a telephone call to Judge Glavin in which you advised him that the authorities required to know what kind of chemicals were generally handled through the Jersey City terminal by the Boyce lines? A. My recollection is that Mr. Atkins and a broker from Mr. Summer's office came to me and told me that there had been some objection coming from someone in South Hackensack because the Boyce line had been involved in some accident in the Hudson Tunnel, where there was an explosion, and they wanted more information on the subject. And my recollection is that it was the brokers that went and got this information and it is my recollection that the brokers are the ones that returned it to me."

The hurdle to overcome was the possibly objectional materials to be transported by the trucks. The parties and their lawyers were not working in a

vacuum. They were alert to the tangible difficulty of having the Township, with knowledge of the inescapable facts, consent to the Boyce kind of business. The application for the building permit as such was never rejected. Two of the three Melillos are willing to be counted as standing for the proposition that the sketch plans were not with the application. But that is of no moment. The very letter of the Township Counsel to the Township Clerk (with whom the application was filed as the Township directed in its application form) set out at some length the specifications and materials to go into the terminal building. The hitch was never as to construction or materials. Irrespective of the strange conduct of the building inspector, as he himself outlined it at the trial, the decision was one of Township public policy; initially for the Board of Adjustment, eventually for the Township Committee under the state law heretofore set out above.

As the court said, "The usual informal practice that obtains in small communities" occurred in this instance. Mr. Chandless, a most experienced and capable attorney, in his capacity of Township Counsel wrote the only general full time Township employee, the person designated to receive building applications, and asked him to bring the Boyce application before the Board of Adjustment. He gave him the special issue at length. And he advised the Boyce attorney by letter of the steps he had taken. Again, the trial judge's comment is illuminating. He said: "And I think if I were in the place of Judge Glavin in this case, and the attorney on the other side was the town attorney involved, where the property was, and I not being familiar with the conditions out there, I think it would be reasonable for a prudent man to rely on what Mr. Chandless told him." .

Thereafter the Board, again in an informal manner, went over it. It develops plainly even out of this confusing record that the Board was worried about the proposed Boyce undertaking; that the explosion of a chemical laden Boyce truck a few miles distant in the Holland Tunnel was a disturbing factor. The record does not show formal recommendation by the Board to its superior, the Township Committee. But the record does show that following the Board's consideration of the case, the Township Committee acted conclusively and rejected the Boyce application. The form of the rejection left no doubt but that not only had the Board of Adjustment denied the application but such decision had been unanimously concurred in by the Township Committee. This complete disposition of the application, including the notification to Boyce thereof, is the written record of the Township of South Hackensack adequately covering its denial of the application. It is well within the principle of Campbell v. City of Hackensack, E. & A.1936, 115 N.J.L. 209, 178 A. 794, 98 A.L.R. 1225, and similar New Jersey decisions.

The entire record in this suit compels the conclusion that Boyce exercised all due diligence to do everything required to obtain the necessary permits from the Township of South Hackensack for the construction and use of the appellees' premises as a truck terminal in accordance with the conditions and terms of the contract of sale between the parties. Because of our conclusion in this regard we are not passing upon the other question raised by appellant with respect to the forfeiture clauses in the agreement, except to observe that the evidence is to the effect that the property was sold later by appellees for a price of $3500 higher than the one called for by the agreement before us.

The judgment of the district court will be reversed. The cause will be remanded with directions to enter judgment for appellant and against appellees for the amount of appellant's $5,000 deposit, plus interest thereon from September 1, 1952 and costs of suit.